# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 21, 2010

## YOUNG BOK SONG v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-C-1792      Steve Dozier, Judge**

---

**No. M2009-02322-CCA-R3-CO - Filed October 29, 2010**

---

A Davidson County jury convicted the Petitioner, Young Bok Song, of seven counts of rape of a child and four counts of aggravated sexual battery, and the trial court sentenced him to serve sixty-five years at 100%. The Petitioner filed a petition for a writ of error coram nobis, which the trial court dismissed. On appeal, the Petitioner raises a number of issues related to the trial court's determination that he was not entitled to relief based upon newly discovered evidence. After a thorough review of the record and the applicable authorities, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Young Bok Song, Pro se, Nashville, Tennessee.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Rachel Sobrero, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts & Procedural History

This case arises from the Petitioner having sexual contact with a minor victim on multiple occasions. Based upon this conduct, the Petitioner was indicted for nine counts of rape of a child and four counts of aggravated sexual battery. After a trial, the Petitioner was convicted of seven counts of rape of a child and four counts of aggravated sexual battery.

The Petitioner appealed his convictions, contending the trial court erred by: (1) not appointing an interpreter; (2) not providing him with a copy of a forensic interview tape; (3) allowing the State to ask him numerous "argumentative" questions; and (4) not granting a new trial based upon newly discovered evidence. In our opinion affirming his convictions on direct appeal, we summarized the facts against the Petitioner as follows:

> The victim, S.L., born on September 8, 1989, and fourteen years old at the time of the trial, testified that she lived with her mother, Chong Suk Pak, and her younger sister, victim J.L., in a two-bedroom apartment in Nashville during the times [the Petitioner] had sexual contact with her. She testified that she did not know or have any memories of her biological father. S.L. said she met [the Petitioner] when she was very young and remembered him living with her family "for a little bit." After [the Petitioner] moved out to live with his ex-wife and children, S.L. visited him at his house a "couple of times a week," but also continued to see [the Petitioner] at her apartment because he often babysat S.L and J.L. while their mother was at work.

> S.L. testified to a number of different sexual encounters with the [Petitioner]. S.L. said the first time she remembered [the Petitioner] having sexual contact with her was when she was about eight years old and her mother was at work. She said she was in her bedroom practicing her flute and her sister was in the living room when [the Petitioner] came into the room and "told [her] to take off [her] clothes." After taking off all her clothes, S.L. closed her eyes at the direction of [the Petitioner] and laid down on her back on the bed while his "penis went inside [her] vagina." S.L. said this hurt and she began to cry, but [the Petitioner] "told [her] to be quiet." S.L. said that "[a]fter [the defendant] finished, [he] told [her] to go wash [herself]," which she did. She said she did not yell for her sister because she was afraid of the [Petitioner]. S.L. could not remember how many times [the Petitioner] had raped her in her bedroom but said it happened more than twice.

> The second incident occurred when S.L. was again in her bedroom practicing her flute and [the Petitioner] told her sister and his own daughter, Mindy, to go outside and play. S.L. did not remember how old she was at the time of this encounter. She said [the Petitioner] came into her room and told her to take off her clothes and then "put his penis into [her] vagina" while she was lying on her bed. She did not recall how long this episode lasted, nor did she remember if [the Petitioner] said anything.

> The third sexual encounter occurred in her living room while S.L.'s

2

mother was at work and her sister was asleep in the bedroom. She said [the Petitioner] told her to take off her clothes, and he then "[p]ut his penis inside [her] vagina" while she laid on the floor on her back. Asked if she ever said anything to [the Petitioner] when he told her to remove her clothes, S.L. said she "sometimes . . . said that [she] didn't want to do it," but he "still did it." S.L. said she felt pain during the rape and cried, but [the Petitioner] told her to be quiet. Asked how she knew her mother was at work, S.L. said that [the Petitioner] called her mother "before . . . to make sure that she was still there." S.L. said she had her eyes closed the entire time and did not know if [the Petitioner] had anything on his penis while he was raping her. S.L. could not remember how many times [the Petitioner] raped her in the living room but said it was more than once.

The fourth sexual encounter happened when S.L. was twelve years old and [the Petitioner] told her to go to her mother's bedroom. S.L. said [the Petitioner] "had a towel and he put it behind [S.L's] butt, and he told [her] to take off [her] clothes and stuff." [The Petitioner] then "put his penis inside [S.L's] vagina," which was "painful" and "made [her] bleed." Asked if [the Petitioner] did anything different compared to the other times he raped her, S.L. explained that "he did it more harder." Afterward, [the Petitioner] picked S.L. up and took her into the bathroom, put her in the bathtub, and told her to wash herself. S.L. said she continued to bleed the next day at school and used tissue to keep the blood from going anywhere. S.L. testified that this was the last time [the Petitioner] put his penis inside her vagina.

The fifth encounter S.L. recalled having with [the Petitioner] was at his house. She said he told her to take off her clothes and "help him scrub his back in the shower." S.L. could not remember what happened after she took off her clothes. The sixth encounter with [the Petitioner] occurred in the living room of S.L.'s apartment when [the Petitioner], lying on the floor, told S.L. to "perform oral sex." S.L. said [the Petitioner] put "[h]is penis inside [her] mouth," and she "was sort of choking" because [the Petitioner] "was making [her] gag" as his penis "was going really deep" in her mouth. Afterwards, [the Petitioner] told S.L. to brush her teeth. S.L. testified that [the Petitioner] made her perform oral sex on him again in her bathroom while her mother, sister, and cousin were all home. She said he turned on the faucet and made her get on her knees and put his penis in her mouth. S.L. said [the Petitioner] made her gag because "[h]e was kind of pushing [his penis] really deep down in [her] throat or something."

3

In addition to these sexual encounters, S.L. described incidents when [the Petitioner] touched her breasts and buttocks. She explained that he squeezed her breasts and buttocks under her clothes on other occasions separate from the ones earlier described. S.L. said [the Petitioner] told her while squeezing her breasts that she "should be thanking him because it was making [her breasts] grow."

S.L. testified that the first person she talked to about what [the Petitioner] did to her was a friend at school. She said she told her friend after attending a school program that dealt with rape and hearing from a girl "talking about how she got raped." The friend told her teacher, Ms. Griffith, whom S.L. later talked to about the sexual encounters. S.L. said she did not tell anyone what happened to her before this because she was afraid of [the Petitioner] as a result of his hitting her and J.L. when they did not listen to their mother or do their school work. She explained that it was [the Petitioner], not her mother, who disciplined her.

J.L., born October 31, 1990 and thirteen years old at the time of trial, testified that she did not remember how old she was when she first met [the Petitioner] but thought she was either in the first or second grade. She said she went to [the Petitioner]'s house once or twice a month, and [the Petitioner] visited or babysat her and S.L. at their apartment while their mother worked. Asked if S.L. ever told her what happened with [the Petitioner], J.L. said S.L. told her that he "raped" her in the living room. J.L. later told their mother what happened, and she "almost fainted." Asked if anything happened between her and [the Petitioner], J.L. said when she was twelve he touched and squeezed her breast while she was in the bathroom of her apartment. She said the touching lasted a couple of seconds and made her a "little nervous." J.L. told S.L. about what had happened after S.L. confided in J.L. about what [the Petitioner] had done to her.

J.L. testified that [the Petitioner] disciplined her and S.L. and was more strict with them than their mother. She explained that he would strike them on the hands or the back of their legs with a metal stick. She said she never told her mother about [the Petitioner] hitting her because she was scared.

The victims' mother, Chong Suk Pak, who moved to the United States from Korea in 1985, testified through an interpreter. She divorced the victims' father in 1994 and he moved back to Korea sometime after that. Pak met [the Petitioner] in 1994 and he lived with her and the victims from May 1994 until

4

March 1995, sleeping in her bedroom while she slept on the couch.  Pak acknowledged having a romantic relationship with [the Petitioner] and said she did not know he had an ex-wife and children in Korea until after he began living with her.  She said he told her that he was divorced.  After [the Petitioner]'s ex-wife and children moved to the United States in 1995, he lived with them but continued to come to Pak's apartment to babysit the victims.  Pak acknowledged she continued her romantic relationship with [the Petitioner] until he moved to Alabama in 2002.

Pak said she allowed [the Petitioner] to babysit her children because she did not "trust anybody else, anyone else, to have [her] children's well-being."  She "could not trust [her] ex-husband, but [she] trusted [[the Petitioner]]" with her children.  Asked why she did not trust her ex-husband with the girls, Pak testified that "he often mention[ed] about sexual abuse of a father of their children; and, so, I just thought he . . . could not be trusted."  She later explained that her ex-husband "watched TV and read . . . newspaper article about sexual abuse by parents, he . . . mentioned about those.  So, when I heard him mentioning that, I began to doubt."  She acknowledged that she did not know if her ex-husband had ever abused her children and the last time he saw the children was in 1993, when S.L. was four years old.

Pak testified that [the Petitioner] helped S.L. and J.L. with their homework and taught them music.  Asked if she had seen [the Petitioner] strike her children, Pak answered that he "frequently" did so and described an incident when [the Petitioner] hit S.L. on the back of her leg with a stick.  She acknowledged that striking children with a stick on their feet or back of their legs is typical punishment in Korea.  Asked if she had ever questioned her daughters as to whether anything had happened to them while they were at [the Petitioner]'s home, Pak answered, "I ask them if he didn't do anything.  I ask that, because he is not their real father."  She testified that S.L. never told her about [the Petitioner]'s abuse, that she learned about it from J.L., and that the news was a shock to her. Pak acknowledged that, after [the Petitioner] moved away, she often told her daughters that if they did not behave he would come back to discipline them.

Brenda Griffith, a teacher at John Trotwood Moore Middle School, testified that in May 2003, her class had just finished sex education classes.  She said representatives from Mercy Ministries talked to the class and acknowledged one of the speakers was a young girl who talked about being sexually abused but had not described the abuse in graphic detail.  About a

5

week later, representatives from the Rape and Sexual Abuse Center came to talk to her class, and soon after their presentation, S.L. told Griffith she had "been raped on numerous occasions, by a friend of her mother's." Griffith said S.L. seemed "very agitated and very nervous" and "upset" at the time.

Dr. Angela Latrice McShepard Carr, a former guidance counselor at John Trotwood Moore Middle School, testified that Ms. Griffith reported S.L.'s abuse to her and that she spoke with S.L. about what had happened with [the Petitioner]. On cross-examination, Dr. Carr could not recall if S.L. used the word "raped" when she talked to her. She acknowledged that S.L. did not describe the abuse in detail.

Dr. Maureen Sanger, a psychologist with Our Kids Center in Nashville, testified that she interviewed S.L. in June 2003 at the Center, which performs medical evaluations of children suspected of being victims of sexual abuse. The interview included S.L.'s medical history, which Dr. Sanger read to the jury. S.L. told Dr. Sanger that no one other than [the Petitioner] had ever touched her sexually, and she denied ever having any "peer sexual contact." On cross-examination, Dr. Sanger acknowledged that "[y]oung children oftentimes don't have clear memories that they're able to report verbally."

Carolyn Smeltzer, a nurse practitioner at Our Kids Center, testified that she performed a physical examination on S.L. Smeltzer explained that S.L. "had basically two areas on her hymen that . . . lacked any hymenal tissue" which "had to have been caused by some sort of a penetrating trauma, . . . something penetrated through her hymen and tore her hymen in both of those spots, all the way down to the base." Asked what could cause such an injury, Nurse Smeltzer said, "[W]hen we see kids with injuries to their hymen, that are talking about sexual abuse, they're typically talking about penile penetration to their . . . vaginal or genital area." Smeltzer acknowledged that such injuries can be the result of "an accidental penetrating injury, like a . . . straddle injury." Nurse Smeltzer testified that there is a difference in the depth of a child's hymen and explained that S.L.'s was "difficult to examine . . . because of the depth of her hymen; it was fairly in-deep inside." Smeltzer said the injury to S.L.'s hymen would have taken approximately one week to heal, and she could not say when the injury took place. Asked if the injury could have taken place when S.L. was four or younger, Smeltzer said, "There's no way to be absolutely certain[,] but this is not-the pattern of injury is not something that we commonly see in a young child." She further explained that when a younger child is sexually penetrated, "It's typically a fairly large injury . . . [the

6

children] really come out with almost no hymenal tissue in a good part of the posterior pole."

Edward Stotts, a case manager for the Department of Children's Services ("DCS"), investigated S.L.'s allegation of sexual abuse by [the Petitioner]. Stotts told S.L. that she would be going to the Child Advocacy Center for a forensic interview and explained that a forensic interview is "basically an interview that's conducted for legal purposes." Stotts said that S.L.'s forensic interview was tape-recorded. Stotts did not participate in S.L.'s interview but did interview J.L. who told him that [the Petitioner] had touched her breast. He said no medical examination was performed on J.L. because "there wasn't a disclosure of any type of penetration" with her.

.   .   .

[The Petitioner] testified that he came to the United States from Korea in December 1994, leaving behind his pregnant ex-wife and daughter. He said he met the victims' mother in Nashville and began living with her, acknowledging they were "lovers." He described his relationship with S.L. and J.L. as an "uncle" or "father" and said the victims' mother asked him to be the disciplinarian of the girls. He acknowledged the victims were afraid of him because he "had to use some corporal punishment and sometimes cry out, I'm yelling; sometimes give them some angry eyes," but when he was not disciplining them, they "were very close . . . just a father and daughters." [The Petitioner] denied sexually abusing S.L. and J.L. and maintained that the victims had lied, explaining, "If I do one sex with the children, her inside vagina will tore down."

*State v. Young Bok Song*, No. M2004-02885-CCA-R3-CD, 2005 WL 2978972, at *1-6 (Tenn. Crim. App., at Nashville, Nov. 4, 2005), *perm. app. denied* (Tenn. Mar. 27, 2006).

The Petitioner filed a petition for post-conviction relief, alleging he received the ineffective assistance of counsel. The post-conviction court dismissed that petition, and, on appeal, we affirmed that dismissal. *Young Bok Song v. State*, No. M2007-00404-CCA-R3-PC, 2008 WL 624926, at *1 (Tenn. Crim. App., at Nashville, Mar. 4, 2008), *perm. app. denied* (Tenn. Sept. 29, 2008).

On September 18, 2009, the Petitioner filed a petition for a writ of error coram nobis, alleging errors in his indictment, trial, jury conviction, and sentence. He also alleged the existence of newly discovered evidence, which, had it been presented to the jury, would have

7

yielded a different result at trial. The newly discovered evidence involved proof of the victim's age and the timing of the indictment in Count 4, his alleged alibi, physical evidence of the victim's body, and the lack of evidence supporting Count 7.

Without holding a hearing, the trial court summarily dismissed the writ, finding:

> In this case, the Court has reviewed the petition and the alleged evidence and finds that the facts are not such that were unknown to the [P]etitioner or to the Court at the time of trial. Based upon the foregoing analysis, the Court is not of the opinion that the evidence supports the claim for relief of error coram nobis. The court finds the evidence presented in the petition was not newly discovered. Even if considered as such, the Court is of the opinion that the evidence does not support his claim for relief of error coram nobis in that it would not have resulted in a different judgment. The Court further notes that most of the issues have been previously raised and addressed in prior appeals.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the trial court erred when it dismissed his petition for a writ of error coram nobis. He asserts that the trial court erred when it summarily dismissed his petition, finding that the evidence presented in his original petition was not unknown to him at the time of trial and, therefore, was not newly discovered. Further, he asserts the trial court erred when it found that the result of his trial would not have been different had this evidence been presented to the jury. Finally, he contends that the issues raised in his petition were not previously raised and addressed in prior appeals and that the trial court should have appointed an attorney and an interpreter. The State counters that the trial court properly dismissed the writ of error coram nobis.

A writ of error coram nobis is available to a defendant in a criminal prosecution. T.C.A. § 40-26-105(a) (2006). The decision to grant or to deny a petition for the writ of error coram nobis on its merits rests within the sound discretion of the trial court. *Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010) (hereinafter "Harris II ") (citing *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007)). Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram

8

nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999); *State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). As previously noted by our Court, "the purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995) (quoting *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1996)).

To establish that he is entitled to a new trial, the Petitioner must show: (a) the grounds and the nature of the newly discovered evidence; (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial; (c) that the Petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (d) the relief sought. *Hart*, 911 S.W.2d at 374-75. Affidavits should be filed in support of the petition or at some point in time prior to the hearing. *Id.* at 375.

> The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. Coram nobis claims therefore are singularly fact-intensive. Unlike motions to reopen, coram nobis claims are not easily resolved on the face of the petition and often require a hearing.

*Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003) (hereinafter "Harris I").

The statute of limitations for seeking a writ of error coram nobis is one year from the date the judgment becomes final in the trial court. T.C.A. § 27-7-103 (2007); *Harris II*, 301 S.W.3d at 144; *Mixon*, 983 S.W.2d at 671. The statute of limitations is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion. *Harris II*, 301 S.W.3d at 144 (citing *Mixon*, 983 S.W.2d at 670). It appears in the case under submission that the writ was timely filed.

9

The Petitioner's claim, as we have deduced it, is that since the time of his trial he has discovered that the victim was more than thirteen at the time of the rape convictions in Count 4 and Count 7, which were both for rape of a child. After noting that rape of a child requires that the victim be less than thirteen years of age, he asserts that he is entitled to relief pursuant to a writ of error coram nobis. The State's proof at trial showed that the victim was born on September 8, 1989, and turned thirteen on September 8, 2002. The Petitioner asserts that the State's proof at his trial included expert medical testimony that the victim, who turned thirteen on September 8, 2002, was examined on June 6, 2003, and that the exam revealed that the victim had been sexually assaulted a few days before this exam. The Petitioner contends, therefore, the proof showed that the victim's sexual assault occurred after she was thirteen years old. The Petitioner explains that, in Korea, a child is considered one year of age on the day of his or her birth. Therefore, a child who is thirteen years of age in the United States would be considered fourteen years of age in Korea. The Petitioner said this information about the victim's age was "totally unknown" to him until the Korean Consular explained to him the difference between the "two cultures."

The Petitioner asserts that the evidence about the victim's age was "newly discovered" because he had a limited understanding of English and was deprived of representation by a Korean consular and/or an interpreter.

First, we note that in our holding affirming the dismissal of the Petitioner's petition for post-conviction relief, we held that the Petitioner's trial counsel was not ineffective for failing to provide an interpreter, stating:

> Trial counsel's testimony, however, which was specifically accredited by the post-conviction court, established that the [P]etitioner neither asked nor demanded that he provide an interpreter at trial. In addition, the [P]etitioner's own evidentiary hearing testimony is somewhat equivocal on whether he ever informed trial counsel that he would pay for an interpreter. The [P]etitioner first testified that he told trial counsel that he would pay for an interpreter but then stated he told trial counsel that he knew five individuals who were willing to interpret for free and counsel should choose an interpreter from that group. We also note that the [P]etitioner, provided with the services of an interpreter at the evidentiary hearing, chose to deliver much of his testimony in English. Furthermore, the [P]etitioner's command of the English language appeared at that hearing to be at least as good, if not better, than that of his interpreter. The [P]etitioner, for example, corrected the interpreter with the correct words when the interpreter began to refer to the public defender as the "public depender," or "public retorney," and exhibited a fairly good grasp of English grammar and word order. The [P]etitioner has not, therefore, met his burden of showing that

10

trial counsel was deficient for failing to hire an interpreter or that he was prejudiced as a result of that alleged deficiency.

*Young Bok Song*, 2008 WL 624926, at *8.

Further, we conclude that the evidence the Petitioner contends should entitle him to relief pursuant to a writ of error coram nobis, i.e., the victim's age at the time of her examination, is clearly not "newly discovered." The State presented the victim's age at trial. The date of her examination was also presented at trial. The victim testified about numerous instances of rape beginning when she was eight years old and lasting over a five year period of time. The fact that she was over thirteen at the time of her physical exam and that she had injuries that the examiner deemed were recent is not evidence about which the Petitioner was unaware. In fact, he cites to the trial transcript to support his contention that this evidence existed. We agree with the trial court that the Petitioner is not entitled to the relief he seeks.

### III. Conclusion

After a thorough review of the record and applicable law, we conclude the Petitioner has failed to demonstrate that the trial court erred when it dismissed his petition for a writ of error coram nobis. Accordingly, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

11